IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BARBARA MIKLOS** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **01-cv-2205** |
| | ) | |
| **ANTHONY J. PRINCIPI, Secretary Department of Veterans Affairs** | ) | |
| | ) | |
| **Defendant** | ) | |

**OPINION AND ORDER**

Pending before the Court is the Defendant's Motion for Summary Judgment on the Amended Complaint filed by Plaintiff Barbara Miklos ("Mrs. Miklos" or "Plaintiff"). In her Amended Complaint, Mrs. Miklos alleges: (1) gender discrimination by Defendant that created a hostile work environment that led to her constructive discharge; and (2) retaliation by Defendant that created a hostile working environment that resulted in her constructive discharge. For the reasons set forth below, Defendant's motion for summary judgment is denied both as to Plaintiff's gender-based hostile work environment/constructive discharge claim and her retaliation-based hostile work environment/constructive discharge claim.

**I. Standard of Review.**

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, fail to demonstrate a genuine issue of material fact and thus, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505 (1986).

The moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry the burden of persuasion at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct 2548 (1986). The nonmoving party must then go beyond the pleadings and, by affidavits, depositions, answers to interrogatories, and admissions on file, designate facts showing that a genuine issue of material fact remains for trial. Id. at 324. In deciding a motion for summary judgment, the facts must be viewed in a light most favorable to the nonmoving party and all inferences must be drawn in that party's favor." Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).

**II. Facts.**

Viewing the facts of record in a light most favorable to Mrs. Miklos, the non-moving party, following is a recitation of those facts relevant to Defendant's motion for summary judgment and Mrs. Miklos's opposition thereto.

Mrs. Miklos began working at the Butler VA Medical Center as a kinesiotherapist ("KT")/corrective therapist in December 1979. November 5, 2002 Miklos deposition ("2002 Miklos deposition"), p. 10. Mrs. Miklos became a KT/corrective therapist supervisor in 1987. Id. at p. 24. Mrs. Miklos was the supervisor of the KT/corrective therapist staff from 1987 until May, 2000. Id. at p. 27. While in this supervisory capacity, Mrs. Miklos performed clinical services in the kinesthiotherapy clinic approximately fifty percent of the time and supervisory services approximately fifty percent of the time. Id. at p. 28. Mrs. Miklos's supervisory responsibilities were eliminated in May, 2000. Id. Thereafter, Mrs. Miklos's title was KT/corrective therapist. Id. at pp. 50-51.

Although her supervisory position was eliminated, Mrs. Miklos maintained the same pay grade, a G-11, that she had as the supervisor of KT/corrective therapy. Id. at p. 49. She was the

only kinesiotherapist who had a GS-11 pay rate. Id.

Mrs. Miklos was assigned new administrative functions that allowed her to maintain the same pay grade. Id. at p. 54. One of Mrs. Miklos's new assignments was that she functioned as the Minimum Data Set ("MDS") coordinator for the Transitional Care Program. Id. Initially this job took up about seventy percent of Plaintiff's time at work. Id. at p. 56. Then up until November, 2001, it was taking up approximately thirty to fifty percent of Plaintiff's time at work. Id. at p. 57. Then, starting in November 2001, and up to the time Mrs. Miklos went on leave in March 2002, this job was taking up approximately 5 to 10 % of Mrs. Miklos's time. Id. at pp. 55-56. This percentage difference resulted because Mrs. Miklos had trained a registered nurse, Janet Martin, to do the work while she was on a two week vacation, and when Mrs. Miklos returned from the vacation in November 2001, she found out that Lawrence Sumansky ("Sumansky') had appointed Martin as the new MDS with Mrs. Miklos to serve as Martin's backup. Id. Sumansky, the program manager for transitional care at the Butler VA, was Plaintiff's first line supervisor. 2002 Miklos deposition, pp. 29-30.

Once Mrs. Miklos was no longer primarily responsible for the MDS work, and without Mrs. Miklos first being told, Martin began using the office that had been solely Mrs. Miklos's prior to her leaving on vacation the office. 2004 Miklos deposition, p. 23. Mrs. Miklos never used this office after November 2001. Id. at p. 25.

Another new assignment given Mrs. Miklos, after her supervisory position was eliminated, to help her keep her GS-11 status was that she provided customer relations/member services for Transitional Care in conjunction with patient representatives and social workers. Id. at p. 54. Mrs. Miklos also was assigned oversight of the PACT program; PACT, the Preservation of Amputation Care and Treatment program, is a diabetic foot program. Id. at p. 38.

Sumansky determined Mrs. Miklos's new clinical functions. Id. at pp. 58-59. Clinical functions were supposed to take up to 50% of Miklos's time but for the first six months, it was not that much. Id. at p. 53.

From May 2000, when her supervisory position was eliminated, until March 2002, when Mrs. Miklos took a leave of absence, Mrs. Miklos did not see any patients in the kinesiotherapy clinic. November 9, 2004 Miklos deposition ("2004 Miklos deposition"), pp. 37-38.

Starting in April or May, 2002, Paul Vensel ("Vensel"), a licensed physical therapist at the Butler VA, began to answer some questions, both by e-mail and by telephone, concerning program areas that were Mrs. Miklos's responsibility as the KT supervisor. 2002 Miklos deposition, p. 41.

On August 4, 2000, Mrs. Miklos, through her counsel, requested EEO-ORM (Office of Resolution Management) counseling from Defendant's EEO office to address gender discrimination. Defendant's Exhibit 3. The onset date was listed as May 2000, with continuation through to the present (which at that time was through to August 4, 2000). Id. Vensel was listed as the comparator. Id.

Mrs. Miklos filed a formal EEO complaint on or about September 22, 2000. Defendant's Exhibit 3. The basis for the claim was gender and Mrs. Miklos's claims were that "Employer has passed over [Plaintiff] first by assigning Paul Vensel as acting and then no[t] selecting [Plaintiff] as acting" and "Employer has failed to select [Plaintiff] for the permanent assignment/position posted since 7/27/00 and closed on 8/17/2000." Defendant's ORM accepted for further processing consideration of whether, on the basis of sex (female), Mrs. Miklos was discriminated against when on or about June 30, 2000, she was not selected for the position of "Acting" Supervisor -Rehabilitation. Defendant's Exhibit 5.

On or about August 10, 2001, Sumansky informed Mrs. Miklos that there would be a change in her duty assignments. 2002 Miklos deposition, p. 83. This change in assignment was that, effective August 20, 2001, in addition to serving as the MDS coordinator, Mrs. Miklos was to oversee the Domiciliary and Veterans Wellness programs. Id. The Domiciliary program involves patients with drug and alcohol problems and the Veterans Wellness program involves the rest of the patient population. Id. at p. 102. Basically, the two programs involve a high risk population working out by using treadmills and other exercise equipment. Oversight of these programs is considered less desirable duty by the KT staff in general because it does not utilize much of a KT therapist's skills; "these are basically people that are physically well, may have some history of some problems, so you supervise or instruct them in general fitness type programs." Id. at pp. 101-02. The Domiciliary and Veterans Wellness programs were located in the basement of building #2, a different building from the one where the KTs' clinic was located. Id. at p. 87.

Prior to Mrs. Miklos being assigned coverage of the Domiciliary and Veterans Wellness programs, it had been assigned to fellow KT/corrective therapist Doug Hilliard. Id. at p. 88. Hilliard stopped doing this job because he had been both supervising the Domiciliary and Veterans Wellness programs and acting as an information security officer ("ISO") and it became too difficult to do both. Id. There were other corrective therapists that Sumansky could have looked to to provide oversight and coverage of the Domiciliary and Veterans Wellness programs.[1] Id. at p. 90.

---

[1]Plaintiff states that "[a]t the time that Plaintiff was assigned the additional collateral duty of oversight of the Domiciliary and Wellness programs, there were a number of corrective therapists who had not been assigned any collateral duties." See Plaintiff's Opposition Brief, pp. 3-4, citing 2002 Miklos deposition, p. 90. In fact, with respect to other potential candidates for

On or about October 29, 2001, Mrs. Miklos filed a second EEO Complaint, alleging that she had suffered reprisal retaliation on August 13, 2001 and August 20, 1001 when her work schedule was changed, and she was assigned oversight of the Domiciliary and Veterans' Wellness programs. Defendant's Exhibit 7.

On November 21, 2001, Plaintiff filed a Complaint against defendant in the United States District Court for the Western District of Pennsylvania in which she alleged that she was discriminated against based upon her gender in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") when, although she was more qualified for the position, she was not promoted to Acting Supervisor of the newly created Rehabilitation Section and instead, a lesser qualified male, Vensel, was made Acting Supervisor and assumed her former supervisory duties. Thereafter, on May 20, 2002, Plaintiff amended her complaint to allege that: (1) the actions stated in her original Complaint also violated the Pennsylvania Human Relations Act and (2) the Defendant retaliated against her in violation of Title VII for complaints of gender discrimination she and her husband filed with the Equal Employment Opportunity Commission/Office of Resolution Management by changing her assignment duties to include coverage and oversight of the Domiciliary and Veterans' Wellness Program. In an earlier Opinion, this Court granted summary judgment in favor of the Defendant on Plaintiff's retaliation claim and denied Defendant's motion for summary judgment with respect to Plaintiff's gender discrimination claims. Court's November 26, 2003 Opinion.

---

this position, when asked "[s]o other than yourself, there were other corrective therapists that possibly Mr. Sumansky could have looked to, to provide this coverage; is that correct?," Plaintiff testified "Yes" and then named "Jill Umstead, Marcella Huey, Heather Rudolph, and a KT assistant, Michael Donnelly." 2002 Miklos deposition, p. 90. No mention is made on page 90 as to whether or not these individuals had other collateral duties assigned to them.

As a result of Mrs. Miklos now overseeing the Domiciliary and Veterans Wellness programs, it became difficult for her to provide care for those patients in the PACT program, the diabetic foot program which Plaintiff also oversaw. 2004 Miklos deposition, pp. 27-29. Mrs. Miklos had to reschedule PACT patients around the Domiciliary and Veterans Wellness programs, which resulted in there being a lot less opportunities for her to see these patients. Id. Mrs. Miklos tried to schedule her time with PACT patients at the same time they were at the Butler VA for other appointments, but this was not always possible once she took over the Domiciliary and Veterans Wellness programs. Id.

Sumansky made Mrs. Miklos get her own coverage for the Domiciliary and Veterans Wellness programs whenever she requested time off or to attend a class. Id. at p. 25. This was a problem because Mrs. Miklos "was a one man show down there, and no one wanted to cover for [her]." Id. at p. 25-26.

Both Sumansky and Paul Vensel, who also saw PACT patients, critiqued Mrs. Miklos for her failure to be able to schedule the PACT patients around her duties concerning the Domiciliary and Veterans Wellness programs. Id. at pp. 29-30. Although Mrs. Miklos would explain that scheduling the PACT patients was a problem because of her responsibilities concerning the Domiciliary and Veterans Wellness programs, Sumansky never seemed to understand. Id. at p. 30.

From March 14, 2002 until September 30, 2002, Mrs. Miklos took an extended sick leave from work. Id. at pp. 29 and 95. Mrs. Miklos requested the leave of absence on the advice of her doctor. Id. at p. 95. Mrs. Miklos's doctors told Mrs. Miklos that her working situation was similar to an abusive relation, "that everyday [she] was being exposed to constant humiliation, getting put down, getting put down, getting put down and it had taken a toll on [her]." Id.

Mrs. Miklos initially took medical leave for six (6) weeks. Id. at p. 76. Sumansky approved the six (6) weeks leave but, via a letter dated April 11, 2002, Sumansky told Mrs. Miklos that she was expected to return to work after that and gave her a long list of requirements that he would want for further medical documentation if she were off any more than the six weeks. Id. Sumansky's letter to Mrs. Miklos also stated that employees on extended sick leave put an undue hardship on the rest of the staff and affected the efficiency of the organization. Id.

Ultimately, Mrs. Miklos extended her leave of absence to six months, so that she was due to return to work on November 12, 2002. Id. at p. 80. For financial reasons and because of a fear of losing her job, Mrs. Miklos came back to work earlier than she originally planned, on September 30, 2002. Id. at pp. 82 and 83.

In August, 2002, in anticipation of returning to work, Mrs. Miklos and her therapist, Debbie Solari, sent to Defendant letters requesting a description of the duties Mrs. Miklos would assume when she returned from her leave of absence. Id. at p. 80. Sumansky and Stan Pakutz, a human resources employee, sent Mrs. Miklos an exact copy of her PD [position description] from May 2000, a time prior to her job duties having been altered. Id. This description was not an accurate one, as Mrs. Miklos found out when she called Sumansky for clarification of the letter. Id. at p. 82. During this telephone call, Mrs. Miklos and Sumansky went over each aspect of the job description that had been sent to Mrs. Miklos; Sumansky told Mrs. Miklos she would not be doing any of the responsibilities listed. Id. Ultimately Mrs. Miklos did not receive clarification of what duties she would perform upon her return to work prior to her returning to work in September, 2002. Id. Sumansky also told Mrs. Miklos during this conversation that the PACT, diabetic foot, program that Mrs. Miklos had run had been dissolved during her absence. Id. at p. 32.

Although Mrs. Miklos had given Sumansky advance notice that she was going to return to work on September 30, 2002, the necessary paperwork to pay Mrs. Miklos was not timely completed. Id. at p. 30. Instead, when she got back to work, Mrs. Miklos was told by the rehabilitation department's secretary that Mrs. Miklos had to send an e-mail to the fiscal department stating that she was back to work. Id. at p. 31. Mrs. Miklos did not know anything about this so she contacted Larry Brandt who told Mrs. Miklos she needed to write a memo that she was back, have Sumansky sign it, and then forward it to the fiscal department. Id. Mrs. Miklos sent the memo to Sumansky who sent it back to Mrs. Miklos saying she had to sign it before he could sign it. Id. Mrs. Miklos did so and about one week later, Sumansky signed the form. Id. By the time all of this was accomplished, Mrs. Miklos received her first paycheck approximately one week late. Id.

Upon Mrs. Miklos return to work in September 2002, she was not given any of her own rehabilitation patients in the main kinesthiotherapy clinic. Id. at pp. 32 and 36. Instead, Sumansky told Mrs. Miklos not to have any patients assigned to her, but rather, just to help other therapists in the kinesthiotherapy clinic. Id. at p. 37. Thus, from on or about May 21, 2000, when her supervisory position was eliminated, until the day she resigned, Mrs. Miklos no longer was assigned any patients in the main kinesiotherapy clinic. Id.

Upon her return to work in September, 2002, Mrs. Miklos also was reassigned coverage of the Domiciliary and Veterans Wellness centers. Id. at p. 32. At that time, Mrs. Miklos learned that the Domiciliary program had been put on hold while she was on leave. Id. at p. 92. The program was placed on hold even though there were other employees, like Paul Vensel and Doug Hilliard, who could have continued the program while Mrs. Miklos was on leave. Id.

On or about October 7, 2002, one week after Plaintiff returned to work, Sumansky met with Mrs. Miklos. Id at p. 39. At that meeting, Sumansky told Mrs. Miklos that he was going to assign her to the wards and that she was to develop a ward program. Id. at pp. 36, 39. This program "was to walk patients at whatever level they already were at with the other therapists or to walk Alzheimer's patients around so they would get tired." Id. at p. 93. Prior to Sumansky assigning Mrs. Miklos this "walking" program, the program did not exist. Id. at p. 34; Sumansky deposition, p. 54.

At this October 7, 2002 meeting, Sumansky also told Mrs. Miklos that she lacked initiative and was idle. Id. at p. 36. This comment was in reference to Mrs. Miklos's performance the first week she was back to work and was made despite the fact that Plaintiff had fully complied with the daily assignments that Mr. Sumansky had given her upon her return from leave." Miklos 2004 deposition, Id. at pp. 35-36 and 39.

Sometime in October, 2002, there was a rehabilitation staff meeting wherein there were staff complaints that the PACT (diabetic foot) patients were continuing to come even though the PACT program had been dissolved. Id. at p. 60. At this meeting, Paul Vensel stated that the staff should be trained to work with the PACT patients. Id. No mention was made about Mrs. Miklos even though she had received a weeks training about fitting PACT patients with shoes and had run the PACT program in the past. Id.

At a KT meeting, with all of the other KTs, Sumansky described the ward program Mrs. Miklos was put in charge of as being "sub therapy." Id. at p. 93. By "sub therapy" that meant that it was not a therapeutic program. "There were no [doctor's] orders. There was going to be no evaluation and there was going to be no assessment, no determining what was appropriate to do." Id. Mrs. Miklos found Sumansky's description of the ward program that she was now in charge

of to be very demeaning and humiliating. Id. at pp. 93-94. "It was humiliating to be in that room with the people that I used to supervise and be assigned to a program that was appropriate for an aide which was sub therapy, and it felt like it was a disciplinary action." Id. at p. 94. Mrs. Miklos also was embarrassed by her new ward program in that when she was walking with patients as part of the new program, she did not know even basic information about the patients so that if and when she was asked questions by other employees about the patient she was with, she did not know even the most basic of answers. Id. at pp. 52-53.

Mrs. Miklos initially contacted an EEO counselor concerning her assignment to the ward program on or about November 7, 2002. Id. at pp. 61-62. Mrs. Miklos then had a telephone EEO interview about her reprisal complaint some time prior to November 25, 2002. Id. at p. 44. In that telephone call, Mrs. Miklos told the interviewer she was worried about retaliation or continued hostile environment by Sumansky because of her complaint and the interviewer told Mrs. Miklos that Sumansky would be contacted about the complaint either on November 25 or November 27. Id.

Sometime in the afternoon of November 27, 2002, Sumansky came down to the Wellness Center where Mrs. Miklos was working and told her "I don't expect you to be sitting down here all afternoon. You need to have a– you need to develop a program. You need to be more creative on the wards. You need to stay on the wards from 12:30 to 4:00, especially between 3:00 and 4:00 for the Alzheimer's patients, I expect you to have a program and provide services to the patients." Id. Mrs. Miklos showed Sumansky her roster of patients that she was seeing and what her program was on the ward. Id. at p. 45. Sumansky told Mrs. Miklos he did not know at what he was looking. Id. So Mrs. Miklos explained again what the documentation was that she was showing him. Id. Sumansky just kept saying "I expect you to be creative and to provide

services." Id. Mrs. Miklos, in fact, was providing services. Id.

Mrs. Miklos was at the Wellness Center during this conversation because that is where her work space and computer were located and so that is where she went when she was not working with patients. Id. at p. 46. Mrs. Miklos tried to explain to Sumansky that she was not sitting there all afternoon, but rather, she had come back to the Wellness Center for a few minutes because the patients she wanted to see were not available and that in a few minutes she would go back upstairs. Id. at pp. 46-47. Mrs. Miklos also explained to Sumansky during this conversation that she thought the ward program was set up for failure. Id. Sumansky told Mrs. Miklos perhaps she would be assigned to recreation and she could be involved with them and hand out coffee at the little get-togethers they have on the wards. Id.

Sumansky's behavior towards Mrs. Miklos during this November 27, 2002 conversation was one of the last straws that caused Mrs. Miklos to resign from her job. Id. at p. 96.

On or about December 1, 2002, Mrs. Miklos, who consulted with her therapist and psychiatrist about her decision, resigned from her position with Defendant. Id. at p. 67.

Mrs. Miklos filed a third complaint with the EEOC on December 2, 2002. Defendant's Exhibit 9. It stated that the basis of Mrs. Miklos claim was "Reprisal EEO Activity Federal Law Suit." Id. It also stated that Mrs. Miklos's claims were that: "Oct. 7, 2002 upon return from medical leave Sup. Larry Sumansky changed my duties again outside position and grade and made derogatory statements about my performance for the short time I was at work." Id. Plaintiff listed the date of occurrence as "Oct. 7, 2002." Id.

Mrs. Miklos filed a fourth complaint with the EEOC on February 14, 2003. Defendant's Exhibit 11. This complaint stated that the basis for her complaint was "reprisal/gender." Id. It also stated that Mrs. Miklos's claim was that "[e]mployer, acting through Larry Sumansky, and

Director forced me to resign my employ due to retaliation for prior protected EEO activity and the hostile work environment they subjected me to upon my return from extended medical leave - my gender was basis for initial EEO activity." Id. The date of the occurrence was listed as "Dec. 1, 2002." Id.

Mrs. Miklos did not receive any written performance evaluations from Sumansky between September 30, 2002 and December 1, 2002, when she resigned from her job. Id. at p. 39. Mrs. Miklos also did not receive any e-mails from Sumansky in which he criticized Mrs. Miklos or reviewed her work performance. Id. at p. 39.

The ward program ceased to exist once Mrs. Miklos resigned and oversight of the domiciliary program was split up among several people. Id. at pp. 84, 92-93.

In general, Mrs. Miklos found it offensive that Sumansky would just always continue to repeat over and over the same things regardless of what Mrs. Miklos would say. Id. at p. 47.

**III. Legal Analysis.**

**A. Gender discrimination claim premised upon Plaintiff's demotion from her position as Supervisor of the Kinesiotherapy section.**

In its motion for summary judgment, Defendant first requests that summary judgment be granted in its favor to the extent Plaintiff's gender discrimination claim is based upon her being demoted from her position as Supervisor of Kinesiotherapy. Defendant's Memorandum of Law in Support of His Motion for Summary Judgment ("Defendant's Supporting Brief"), pp. 7-10. The basis for its request is the contention that Plaintiff failed to exhaust her administrative remedies with respect to such a claim. Id. at pp. 7-8. "When she did contact Defendant's EEO Office, through her counsel, she did not allege any discrimination based upon the elimination of these [supervisory of Kinesiotherapy] duties. Rather, Plaintiff's allegations, at that time, as well

as subsequently when she filed her formal EEO Complaint, through counsel, pertained to not being the 'Acting' Supervisor of the newly created Rehabilitation Section." Id.

In response, Plaintiff states "a review of the Amended Complaint reveals that Plaintiff is not asserting an independent claim concerning her demotion. Rather, this employment action is noted in the Amended Complaint merely to place Plaintiff's claim concerning the failure to assign her to the acting supervisor position in context, i.e, that her supervisory duties were stripped from her and reassigned to a less qualified male employee." Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Opposition Brief"), p. 12.

Given Plaintiff's concession that her Amended Complaint does not contain "an independent claim concerning her demotion," the Court finds it unnecessary to address substantively Defendant's failure to exhaust administrative remedies argument. The relevancy of this evidence as it relates to Plaintiff's claim that Defendant discriminated against her on the basis of her gender when she was not given the position of Acting Supervisor of the Rehabilitation Section will, if raised by the parties, be decided by the Court prior to the trial of the matter.

**B. Scope of Plaintiff's claims in her Amended Complaint.**

Contained within the parties' arguments concerning the viability of Plaintiff's claims in her Amended Complaint is a sub-argument on what events can be considered by the Court in deciding Defendant's motion for summary judgment on Plaintiff's Amended Complaint. First, Defendant argues that "Plaintiff's administrative claims submitted by her counsel limit her charges [in her Amended Complaint] to events after her return to work on September 30, 2002." Reply Brief, p. 6. To the contrary, Plaintiff argues that the events underlying her claims include

events which took place prior to her taking an extended medical leave in March 2002, beginning with her supervisory duties being transferred to Paul Vensel in May 2000.

In total, Plaintiff filed 4 complaints with the EEOC. As stated above, the first complaint was filed on September 22, 2000. The basis for the claim was gender and Plaintiff's claims were that "Employer has passed over [Plaintiff] first by assigning Paul Vensel as acting [supervisor] and then not selecting [Plaintiff] as acting [supervisor]" and "Employer has failed to select [Plaintiff] for the permanent assignment/position posted since 7/27/00 and closed on 8/17/2000." Defendant's Exhibit 3. The second EEO complaint was filed on or about October 29, 2001 and alleged that Plaintiff suffered reprisal retaliation on August 13, 2001 and August 20, 2001 when her work schedule was changed and she was assigned oversight of the Domiciliary and Veterans' Wellness programs. Defendant's Exhibit 7. The third complaint was filed with the EEOC on December 2, 2002. Defendant's Exhibit 9. It stated that the basis of her claim was "Reprisal EEO Activity Federal Law Suit." Id. It also stated that Plaintiff's claims were: "Oct. 7, 2002 upon return from medical leave Sup. Larry Sumansky changed my duties again outside position and grade and made derogatory statements about my performance for the short time I was at work." Id. Plaintiff listed the date of occurrence as "Oct. 7, 2002." Id. Plaintiff filed her fourth complaint with the EEOC on February 14, 2003. Defendant's Exhibit 11. This complaint stated that the basis for her complaint was "reprisal/gender." Id. It also stated that her claim(s) was that "[e]mployer, acting through Larry Sumansky, and Director forced me to resign my employ due to retaliation for prior protected EEO activity and the hostile work environment they subjected me to upon my return from extended medical leave - my gender was basis for initial EEO activity." Id. The date of the occurrence was listed as "Dec. 1, 2002." Id. Plaintiff also filed a previous law suit against Defendant alleging Tile VII violations on November 2001. Doc. #1.

As succinctly explained by the court in Kerrison v. Kane Community Hospital, 2000 WL 33223084 (W.D. Pa. Dec. 1, 2000):

> [i]t is well settled that the filing of a charge with the EEOC and receipt of a Notice to Sue letter are prerequisites to a civil action under Title VII. . . . The parameters of the federal court action are "defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." When a claim has not specifically been presented in an administrative charge, the test for whether that claim may be presented to the district court is "whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom."

Id. at *9 (citations and quotations omitted).

Here, the December 2, 2002 EEOC Complaint alleged reprisal and stated that Sumansky had again changed Plaintiff's duties. Soon thereafter, Plaintiff filed the February 14, 2003 EEOC Complaint, charging Defendant with creating a hostile work environment that ultimately led to a constructive discharge and stating that the bases for the actions were retaliation and gender. Given these allegations, we find that the acts alleged in Plaintiff's subsequent Title VII suit with respect to her both her gender-based and retaliation-based hostile work environment/constructive discharge claims "are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." Id. In other words, in reviewing Defendant's Motion for Summary Judgment and Plaintiff's response thereto, the Court will take into consideration all relevant events that occurred between Plaintiff's loss of her supervisory duties in May 2000 and her resignation on December 2002.

Defendant also argues that in deciding its motion for summary judgment, the Court should not take into account in making its analysis that Plaintiff was assigned coverage of the Domiciliary and Veteran's Wellness Centers so that a male employee could take over other duties, because "this Court has already determined that Mr. Sumansky's decision to replace Mr.

Hilliard with Plaintiff for these duties was 'objectively logical'." Defendant's Supporting Brief, pp. 17-18.

In our November 16, 2003 Opinion, the Court granted Defendant's motion for summary judgment on Plaintiff's claim that Defendant violated Title VII when it retaliated against Plaintiff for filing a complaint with the EEOC by assigning her coverage of the Domiciliary and Veterans' Wellness Centers. This analysis did not include an analysis of whether Defendant discriminated against Plaintiff on the basis of her gender when Sumansky assigned Plaintiff these duties. As such, Plaintiff is not precluded from arguing that this action is relevant to her gender-based hostile work environment/constructive discharge claim. Plainitff, however, is precluded from arguing that this conduct is relevant to her retaliation-based hostile work environment/ constructive discharge claim.

**C. Plaintiff's gender-based hostile work environment/constructive discharge claim.**

As succinctly explained by the court in Strauser v. Jay Fulkroad and Sons, Inc., 2005 WL 2020636 (M.D. Pa. July 28, 2005):

> [Plaintiff] relies upon a hostile work environment theory under Title VII to make her case. In order to bring an action successfully under Title VII for a hostile work environment, a Third Circuit plaintiff must prove a prima facie case that: (1) she suffered intentional discrimination because of her gender; (2) the discrimination was pervasive [or] regular;[2] (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person on the same sex in that position; (5) the existence of respondeat superior liability. Since [Plaintiff's] claim is a compound hostile work environment constructive discharge claim, she must also prove that the "working conditions were so intolerable that a reasonable person would have felt compelled to resign."

---

[2]Third Circuit cases have often phrased this element as requiring "pervasive and regular" harassment. The Third Circuit recently acknowledged, however, that the difference between its own formulation of this element and that of the Supreme Court, which requires "severe or pervasive" harassment, is significant, and that the latter must control. See Jensen v. Potter, 435 F.3d 444, 449 n. 3 (3d Cir. 2006) (internal citations omitted).

Id. at *6 (citations omitted). See also Pennsylvania State Police v. Suders, 542 U.S. 129, 134, 124 S.Ct. 2342, 2347 (2004) (stating:"[t]o establish hostile work environment, plaintiffs . . . must show harassing behavior 'sufficiently severe or pervasive to alter the conditions of [their] employment.)

Defendant raises several arguments in support of his position that summary judgment must be granted as to Plaintiff's gender-based hostile work environment/constructive discharge claim. Defendant's Supporting Brief, pp. 16-20.

1. Whether Plaintiff suffered intentional discrimination because of her gender.

Defendant first argues that "Plaintiff cannot even satisfy the first element of her hostile work environment claim because she cannot show that she was subjected to intentionally harassing behavior because she is a woman." Defendant's Supporting Brief, p. 16. "[S]he has no evidence that Mr. Sumansky's conduct towards her in any way related to her gender." Id. at p. 17. In response, Plaintiff argues that she was subjected to intentional discrimination because of her gender when: (1) in May 2000, Plaintiff's supervisory duties were stripped and reassigned to Mr. Vensel; (2) in November 2001, Plaintiff's MDS duties were stripped and Plaintiff was assigned duties to oversee the Domiciliary and Wellness programs so that a male employee could perform other duties; (3) the clinical duties Plaintiff had performed in connection with the PACT program were eliminated during Plaintiff's leave of absence from March 2002 to September 2002, despite the expressed need for an individual with PACT related training; (4) on or about October 7, 2002, Sumansky told Plaintiff that she was idle and lacked initiative and that he was assigning her to develop a new ward walking program; (5) at a rehabilitation department meeting, Sumansky described Plaintiff's ward program as "sub-therapy;" and (6) shortly before

Plaintiff resigned in December, 2002, Sumansky threatened to further reduce Plaintiff's duties to passing out coffee at creation department get-togethers.

We have already held that with respect to Sumansky taking away Plaintiff's supervisory duties and giving them to a male, Paul Vensel, there is a genuine issue of material fact as to whether Sumansky took said action against Plaintiff because of her gender. Considering the remaining evidence in light of this factual issue, a reasonable fact finder could conclude, looking at the totality of the events that Plaintiff was subjected to intentional discrimination because of her gender.

2. Whether the discrimination was pervasive [or] regular.

Defendant next argues that Plaintiff cannot establish that the alleged conduct was "severe and pervasive." Defendant's Supporting Brief, p. 19. Plaintiff, of course, contends that the above-listed conduct was severe and pervasive. Plaintiff's Opposition Brief, pp. 16-22.

In Jensen v. Potter, 435 F.3d 444, 451 (3d Cir. 2006), the appellate court recently explained that:

> [t]he statute prohibits **severe or pervasive** harassment; it does not mandate a happy workplace. Occasional insults, teasing, or episodic instances of ridicule are not enough; they do not "permeate" the workplace and change the very nature of the plaintiff's employment. *See Faragher,* 524 U.S. at 788, 118 S.Ct. 2275; *Harris,* 510 U.S. at 21, 114 S.Ct. 367. Factors to be weighed include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. 367. No one factor is dispositive, and the analysis must focus on the "totality of the circumstances." *Andrews,* 895 F.2d at 1482.

Jensen, 435 F.3d at pp. 451-52. Applying this law to the facts of this case and looking at the "totality of the circumstances," the Court finds that Plaintiff has produced evidence such that a reasonable fact finder could conclude that Plaintiff was subjected to "severe or pervasive"

discrimination based upon her gender.

3. Whether the discrimination would detrimentally affect a reasonable person of the same sex in that position?

Defendant also argues that and that "this alleged conduct at issue, which at best, involved only minor criticism, is also not the sort that a reasonable woman would perceive as severe and pervasive." Defendant's Supporting Brief, p. 19. Contrary to this argument, we find that a reasonable fact finder could conclude that the discrimination would detrimentally affect a reasonable person on the same sex in that position.

4. Existence of respondeat superior liability.

Fourth, Defendant argues that Plaintiff cannot prove vicarious liability:

> prior to contacting the EEO Office through her attorney to initiate the administrative process for these present allegations, Plaintiff did not complain to anyone that Mr. Sumansky was subjecting her to a sexually hostile work environment, thereby providing Defendant with an opportunity to halt the harassment. Thus, because Plaintiff never informed her employer that she believed that she was being subjected to a sexually hostile environment, thereby providing Defendant an opportunity to end the harassment, she cannot recover on a hostile work environment claim.

Defendant's Supporting Brief, pp. 19-20

As explained in Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275 (1998):

> [i]n order to accommodate the principle of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees, we adopt the following holding in this case and in *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), also decided today. An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.

Given that there is no dispute that Sumansky is "a supervisor with immediate (or successively higher) authority over" Plaintiff, clearly Defendant would be subject to vicarious liability to

Plaintiff for an actionable hostile environment created by Sumansky.

Of course, the analysis is not complete, for the Faragher Court also instructs that:

> [w]hen no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. See *Burlington,* 524 U.S., at 762-763, 118 S.Ct., at 2269.

Id. at pp. 807-08. The Supreme Court further elaborated in Suders, that "an employer does not have recourse to the *Ellerth/Faragher* affirmative defense when a supervisor's official act precipitates the constructive discharge; [but that] absent such a 'tangible employment action,' however, the defense is available to the employer whose supervisors are charged with harassment." Suders, 542 U.S. at pp. 140-41.

Here, Defendant simply argues that summary judgment should be granted with respect to Plaintiff's hostile work environment/constructive discharge claims because Plaintiff did not inform Defendant that Sumansky was harassing her prior to resigning and therefore, there was no opportunity for Defendant to end the harassment. Defendant's Supporting Brief, pp. 19-20. Defendant does not address the question of whether or not the conduct at issue involves a "tangible employment action." This is critical because if "a tangible employment action" was involved, then Defendant cannot raise the *Ellerth/Faragher* affirmative defense. Additionally, assuming Defendant is entitled to raise the *Ellerth/Faragher* affirmative defense, Defendant does not provide the Court with any evidence of its efforts to prevent and correct harassment in its workplace. Absent such information, the Court cannot grant summary judgment in favor of

Defendant on the basis of Plaintiff's inability to establish respondeat superior liability.

5. Plaintiff's suffering of "intolerable conditions" sufficient to support a claim of constructive discharge.

Defendant's final argument in support of his motion for summary judgment on Plaintiff's gender-based hostile work-environment/constructive discharge claim is that Plaintiff has failed to demonstrate that she suffered "intolerable conditions" sufficient to support her allegations of constructive discharge." Defendant's Supporting Brief, p. 28.

In Suders, the United States Supreme Court held:

> [t]o establish hostile work environment, plaintiffs like Suders must show harassing behavior "sufficiently severe or pervasive to alter the conditions of [their] employment." Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal quotation marks omitted); see Harris v. Forklift Systems, Inc., 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) ("[T]he very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their ... gender ... offends Title VII's broad rule of workplace equality."). Beyond that, we hold, to establish " constructive discharge," the plaintiff must make a further showing: She must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response.

Suders, 542 U.S. at pp. 133-34. The Suders Court further stated:

> [f]or an atmosphere of sexual harassment or hostility to be actionable, we reiterate, see *supra,* at 2347, the offending behavior "must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Meritor, 477 U.S., at 67, 106 S.Ct. 2399 (internal quotation marks and brackets omitted). A hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign. *See, e.g.,* Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1160 (C.A.8 1999) ("[A]lthough there may be evidence from which a jury could find sexual harassment, ... the facts alleged [for constructive discharge must be] ... so intolerable that a reasonable person would be forced to quit."); Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (C.A.7 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.").

Id. at pp. 146-47 (footnote omitted).

Viewing the facts in a light most favorable to Plaintiff, the Court finds that the circumstances of Plaintiff's employment were such that a reasonable fact finder could find that Plaintiff's "working conditions [were] so intolerable that a reasonable person would have felt compelled to resign." Id. at p. 147.

Accordingly, we will deny Defendant's motion for summary judgment on Plaintiff's gender-based hostile working environment/constructive discharge claim. In so holding, however, we believe it important to emphasize that this Court does not find Plaintiff to have a particularly strong gender-based hostile work environment/constructive discharge claim against Defendant. Nonetheless, Plaintiff's case is sufficient to withstand summary judgment.

**D. Plaintiff's retaliation-based hostile working environment/constructive discharge claim.**

In Jensen, *infra.*, the appellate court recently set forth the elements underlying a claim of retaliatory harassment – a plaintiff must prove that:

> (1) she suffered intentional discrimination because of her protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present. *See Weston v. Pennsylvania,* 251 F.3d 420, 426 (3d Cir.2001); *Robinson [v. City of Pittsburgh],* 120 F.3d [1286,] 1300-01 [(3d Cir. 1997)]

Jensen, 435 F.3d at p. 449 (footnotes omitted). Defendant argues that summary judgment must be granted on Plaintiff's claim retaliation-based hostile work environment/ constructive discharge claim because Plaintiff cannot establish: (1) that she was subjected to any intentionally harassing discrimination because of her prior EEO activity; (2) that the alleged conduct was "severe and pervasive;" (3) the existence of respondeat superior liability because she did not take reasonable action to end the harassment that she alleges was occurring; and (4) that she suffered

"intolerable conditions" such that she was constructively discharged from her employment with Defendant. Defendant's Supporting Brief, pp. 20-28. Plaintiff states, and Defendant does not dispute, that "Plaintiff has established the first element as she filed a number of EEO complaints alleging gender discrimination and/or retaliation during the period of September, 2000 through December 2, 2002 and also filed a federal lawsuit based on these allegations." Plaintiff's Opposition Brief, p. 13.

1. Whether Plaintiff suffered intentional discrimination because of her protected activity?

Concerning this issue, the Jensen court explained:

> [t]he test's first element concretely expresses the principle that Title VII is not "a general civility code for the American workplace." *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80-81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Many may suffer severe or pervasive harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief. This first step, therefore, requires us to identify what harassment, if any, a reasonable jury could link to a retaliatory animus. *See Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 280-81 (3d Cir.2000); *Shaner v. Synthes,* 204 F.3d 494, 500-01 (3d Cir.2000); *cf. Aman v. Cort Furniture,* 85 F.3d 1074, 1081-83 (3d Cir.1996).
>
> In determining whether conduct was retaliatory, our cases have tended to focus on two factors: (1) the "temporal proximity" between the protected activity and the alleged discrimination and (2) the existence of " 'a pattern of antagonism in the intervening period.' " *See Abramson v. William Paterson Coll. of New Jersey,* 260 F.3d 265, 288 (3d Cir.2001) (quoting *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920-21 (3d Cir.1997)). Timing alone raises the requisite inference when it is "unusually suggestive of retaliatory motive," but even if "temporal proximity ... is missing, courts may look to the intervening period for other evidence of retaliatory animus." *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 503-04 (3d Cir.1997). Despite this focus, "[t]hese are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." *Farrell,* 206 F.3d at 280; *see also Kachmar v. SunGard Data Systems, Inc.,* 109 F.3d 173, 178 (3d Cir.1997) ("The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific.").
>
> . . . [W]e have deemed it improper to isolate incidents of facially neutral harassment and conclude, one by one, that each lacks the required discriminatory

> animus. *See, e.g., Cardenas,* 269 F.3d at 260-61; *Aman,* 85 F.3d at 1081-84. Because "it is often difficult to determine the motivations of an action[,] .... [the] discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Andrews,* 895 F.2d at 1484.

Id. at pp. 449-50.

Although Plaintiff does not explicitly state which events underlie her retaliation-based hostile work environment claim, on pages 17-21 of her Opposition Brief, Plaintiff lists a number of events and the Court will determine whether based upon these events Plaintiff has created a genuine issue of material fact on the issue of whether Plaintiff suffered intentional discrimination because of her protected activity which occurred in September 2000 (filing of charge with EEOC), October 2001 (filing of charge with EEOC), November, 2001 (filing of Title VII lawsuit against Defendant), December 2002 (filing of charge with EEOC), and February 2003 (filing of charge with EEOC). These events are as follows. First, after May, 2000, Plaintiff was not assigned any rehabilitation patients in the main therapy clinic and therefore, she did not perform any of the clinical duties of a corrective therapist from the time of her demotion until she resigned in December 2002. Id. at pp. 17-18. Second, in November 2001, Plaintiff's MDS duties were substantially reduced and she was assigned to the Domiciliary and Wellness Centers, which had been performed by a GS-10 and which was an undesirable position due to the low level of therapeutic skills involved. Id. at p. 18. Third, when Plaintiff requested an extended medical leave in March 2002, Sumansky approved the request, but qualified his approval with a statement that Plaintiff's taking the leave would place an undue hardship on Plaintiff's co-workers and would impair the efficiency of the organization. Id. Fourth, in August, 2002, in preparation for returning to work, Plaintiff contacted Sumansky and asked him for a job description. Id. at pp. 18-19. Sumansky first sent Plaintiff her unaltered position description from May, 2000, but when

Plaintiff spoke to Sumansky about this job description, Sumansky clarified that Plaintiff would not be doing any of these jobs. Id. at p. 19. Ultimately Plaintiff had to return to work without knowing what work she would be doing upon her return. Id. Fifth, when Plaintiff returned to work on September 30, 2002, she discovered that during her absence the Domiciliary program had been put on hold and the PACT program dissolved. Id. Sixth, Sumansky assigned Plaintiff to restart the Domiciliary program and was reassigned to the Wellness program. When Plaintiff asked Sumansky what else she would be doing, Sumansky told Plaintiff that he did not know, but that for the time being Plaintiff should help out the other therapists in the main clinic and not have any patients assigned to her directly. Id. at pp. 19-20. Seventh, the PACT program, which had comprised the majority of Plaintiff's clinical duties prior to her leave was not restarted upon Plaintiff's return to work, even though the need for such a program was discussed in an October 2002 staff meeting. Id. Eighth, even though Plaintiff had given advance notice of her return to work, the paperwork to restart Plaintiff's pay had not been completed and by the time it was completed, Plaintiff's first paycheck was one week late. Id. Ninth, although Plaintiff had fully complied with the duty assignments given to her by Sumansky upon her return from medical leave, on October 7, 2002, Sumansky told Plaintiff that she was idle and lacked initiative and that he was assigning her to develop a new ward program that involved duties such as walking patients, particularly Alzheimer patients, around the floor until they were tired. Id. Later, in a rehabilitation meeting, Sumansky described this ward program as sub-therapy because it was not a therapeutic program, i.e. it was not ordered by doctors, no evaluations were done on the patients, and no assessments were performed to determine what was appropriate for each patient. Id. at pp. 20-21. Tenth, and finally, on November 27, 2002, immediately after Mr. Sumansky was interviewed by the EEO investigator concerning Plaintiff's most recent charge, Sumansky came

to Plaintiff's office, criticized the work she was doing on the ward program, and when she attempted to show him documents that showed what she had accomplished with respect to ward program, Sumansky stated that he did not know what he was looking at and repeatedly stated that Plaintiff needed to be creative and provide services. Id. at p. 21. Sumansky concluded this conversation by telling Plaintiff that perhaps he should assign her to recreation so she could help hand out coffee at the ward get-togethers. Id.

Viewing this evidence as a whole in a light most favorable to Plaintiff (with the exception that we have not, for the reasons set forth above, included Plaintiff's allegation with respect to her assignment to the Domiciliary and Wellness Centers in our analysis), the Court finds that a reasonable fact finder could conclude that Sumansky was harassing Plaintiff and that there was a retaliatory animus behind said harassment.

2. Whether the retaliatory harassment was severe or pervasive.

On this issue, the Jensen court explained:

> [h]aving identified the conduct that a reasonable jury could label retaliatory, our next task is to measure the harassment's severity or pervasiveness. As stated earlier, this inquiry has both subjective and objective components. *See Faragher,* 524 U.S. at 787, 118 S.Ct. 2275. . . .
>
> Of course, [a plaintiff's] subjective reaction to the discrimination is not enough. She must also show an objectively hostile work environment. Two elements of our test relate to this question. The second prong requires severe or pervasive harassment; the fourth requires discrimination that would have detrimentally affected a reasonable person. *See ante* at 7-8. When applied, they coalesce into a single inquiry: did the plaintiff suffer **retaliatory harassment** severe or pervasive enough to "alter the conditions of [her] employment and create an abusive working environment"? *See Meritor,* 477 U.S. at 67, 106 S.Ct. 2399; *Robinson,* 120 F.3d at 1300-01.
>
> Like the requirement of intentional discrimination, the need for an objectively abusive work environment further distinguishes Title VII from a generalized "civility code." *Oncale,* 523 U.S. at 81, 118 S.Ct. 998. The statute prohibits severe or pervasive harassment; it does not mandate a happy workplace. Occasional

> insults, teasing, or episodic instances of ridicule are not enough; they do not "permeate" the workplace and change the very nature of the plaintiff's employment. *See Faragher,* 524 U.S. at 788, 118 S.Ct. 2275; *Harris,* 510 U.S. at 21, 114 S.Ct. 367. Factors to be weighed include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. 367. No one factor is dispositive, and the analysis must focus on the "totality of the circumstances." *Andrews,* 895 F.2d at 1482.
>
> [T]he severe or pervasive standard . . . is especially crucial in the retaliation context. When one employee makes a charge under Title VII against another, some strain on workplace relationships is inevitable. *See Von Gunten,* 243 F.3d at 870.

Id. at pp. 451-52.

Defendant argues Plaintiff "simply has not produced any evidence that she was subjected to 'severe or pervasive' harassment because of any improper retaliation." Defendant's Reply Brief, p. 7. Contrary to Defendant's position, the Court finds that a reasonable fact finder could conclude that this retaliatory harassment was severe or pervasive.

3. Respondeat superior liability.

For the reasons set forth above in our discussion as to why the Court cannot grant Defendant's motion for summary judgment on Plaintiff's gender-based hostile work environment/constructive discharge claim based upon Defendant's argument that Plaintiff has not established respondeat superior liability, the Court also denies Defendant's motion for summary judgment on Plaintiff's retaliation-based hostile work environment/constructive discharge claim based upon the argument that Plaintiff has not established respondeat superior liability.

4. Plaintiff's suffering of "intolerable conditions" sufficient to support a claim of constructive discharge.

Finally, the Court finds that viewing the facts in a light most favorable to Plaintiff, the circumstances of Plaintiff's employment were such that a reasonable jury could find that Plaintiff's "working conditions [were] so intolerable that a reasonable person would have felt compelled to resign." Suders, 542 U.S. at p. 147.

**IV. Conclusion.**

For the reasons stated above, Defendant's motion for summary judgment on Plaintiff's gender-based hostile working environment/constructive discharge claim and Plaintiff's retaliation-based hostile working environment/constructive discharge claim is denied. An appropriate order follows:

**ORDER**

AND NOW, this 16th day of March, 2006, it is HEREBY ORDERED, ADJUDGED and DECREED that Defendant's motion for summary judgment is DENIED as to Plaintiff's gender-based hostile working environment/constructive discharge claim and Plaintiff's retaliation-based hostile working environment/constructive discharge claim

It is further ORDERED, ADJUDGED and DECREED that the parties shall appear before this Court on March 28th, 2006 at 10:00 am for a settlement conference. Counsel shall attend in person and have settlement authority. If this matter is not settled, then:

(1) Plaintiff shall file her amended pre-trial statement on or before April 21, 2006;

(2) Defendant shall file his pre-trial statement on or before May 22, 2006; and

(3) a pre-trial conference will be held in this matter on July 24, 2006 at 9:00 A.M. with a jury TRIAL in this matter starting immediately thereafter.

S/Maurice B. Cohill, Jr.
Maurice B. Cohill, Jr.
Senior District Judge